Cynthia Cobbs and Justice Aurelia Puczynski and myself, Justice James Fitzgerald-Smith. Our procedure is as follows. We let the appellant go first and give you 10-12-14 minutes, uninterrupted. Then we will ask questions. Then we let the appellee present their case. And at the end of that, again, we ask our questions. Then it's the appellant again and our questions and then the ruling. Just so you know, we will not interrupt you in your arguments. And with that, I guess we can start out. So, appellant, go ahead. Thank you, Your Honor. May it please the court. My name is Doug Johnson and I represent the David Ramirez-Martinez. He's currently serving 60 years on his first-degree murder charge. Thank you for calling this oral argument. The murder occurred over 20 years prior to the arrest. It occurred in 1994. The defendant was not a suspect in the original investigation, but the jury convicted him of the murder of a woman that there was no evidence he had any reason to ever be mad at or kill and there was no evidence he ever had any fight with her. I know the state does not have to prove motive in a criminal prosecution, but it certainly would go toward the evidence to suggest that the jury got it right. I am very aware that an sufficiency of evidence argument is hard to win. I do want to, though, however, in this case, and I'm aware the court has to give great deference to the jury's decision, but I submit to you no reasonable jury could have reached the result that happened here. I'll summarize the evidence. Two tiny drops of blood. That's it. Two tiny drops of blood against David Martinez, and he now sits in the penitentiary. We don't know when those blood drops got there. He had no animosity, no, well, let me go what the state says the evidence was. When David was confronted out west over 20 years later, he couldn't explain his whereabouts on the day of the murder. This is a man who speaks broken English, and he was approached by two officers who did not tell him what they were doing, that he was a suspect, and so he just talked about the loss of his wife's roommate with them, and they said, well, he couldn't tell us where he was. It's undisputed that he worked at Michael Jordan's restaurant, but because of the passage of time, Michael Jordan's restaurant closed in 1999. He couldn't get records to show that, and he also was asked, when were you last in that apartment? Because a great issue in this case, I guess, is when was that blood left there? When were you last in there? I'm sorry, I don't know what he said, or he couldn't pinpoint it, and then Carol was asked that, his wife Carol, who admittedly he had a very odd relationship with, but she was asked, and I think she initially said, or at least the police reported, she said, I don't know, he might have visited me three or four months prior. She didn't know the magnitude of what she was saying if she said it at all, and there's no recording of that conversation, but the state says that's evidence against Mr. Martinez. Then we get to, the state says, well, no one else would have known the back door was unlocked. Only someone familiar with the apartment would have adapted to Sheila's appearance. The towel was neatly placed in the kitchen garbage. Only the defendant knew the stairs were noisy. This is not evidence. This requires incredible speculation to call David guilty, and if you look through their brief, I won't reiterate it all, but I applaud them for what they're, of course, it's their job to confirm this verdict or have it upheld, but it shows you what a stretch they have to make to say why David Ramirez is the guilty party. They do offer, very briefly, a motive. Their motive is that the defendant was possessive of Carol, and so he went over to talk to Carol, and when she was not there, he flew into a rage and killed Bonnie. I submit to you, when we look at John B., how can we believe that completely speculative, and I submit unreasonable motive to David? I submit this case is not a mystery at all. The only mystery, there are two questions. Why was David Ramirez prosecuted, and why was John B. not prosecuted? A few things about John B. At the time of the murder, they were in the process of divorcing. He had a history of drug and alcohol problems. He had beaten her, Carol, I'm sorry, Bonnie, in the past. He admitted, in his testimony, the relationship was pretty contentious. He was not allowed into the apartment, although he did go in with his daughter to see her room, and we don't know the history of everything else, but at one time, he was not allowed in. He testified, well, it was pretty contentious at the time of her death, and we were still arguing about alimony, but we were letting the lawyers work that out. This is a man who had beaten her in the past, and yet we're supposed to believe that, oh, it was all cool with the money in him. This is a man who said, according to evidence that didn't get in, if you leave me, I will kill you. This is a man who the state then says, well, he had an alibi. He took his daughter to the carnival, his young from the murder scene. He said initially that he left work between three and five, and he wasn't questioned 23 plus years later. He was questioned immediately. He came to the scene, and he was questioned, and he said he left work between three and five. Later on, at the grand jury, he said, well, I left after five. Contrary to Bonnie's friends, he denied stalking her. He denied slapping her. He denied doing anything wrong to her, but again, the jury didn't get to hear a lot of that, and I'll touch on that in my short time in a second, but if you look at the tub, this was a passion killing, and I don't want to go into too much of criminal profiling, but are we to believe that this David Ramirez, who had no bone to pick with Bonnie, strangled her, threw all these things in the tub, including the VCR, and then put two butcher knives in her breasts? That's what David Ramirez did. How about John B., a guy that had a history of animosity and beating her? So not only that, John B. demonstrated, and this did get before the jury, thankfully, demonstrated how Bonnie was killed when it seemed to, I think, anybody, B., any lay person, well, she was killed because she got stabbed with two butcher knives, but what John B. did with Carol shortly after the murder was, let me show you how it was done to Carol, and then he demonstrated strangling her. How did he know that? I mean, this is, it is absurd that David is sitting in prison right now for a murder that two blood drops of blood versus what's against John B. The hearsay, the exclusion of evidence in the other issues, and certainly I think the sufficiency of evidence argument goes to the prejudice, because I believe this was a very, very, if you believe the evidence was sufficient, it was certainly a close case. The VCR, the first judge, Judge Gaughan said, yeah, that's coming in, and the argument was from, I believe, Teresa and Carol, that John and Bonnie argued a lot about the VCR, and in one of the lines was, well, Bonnie said, I'm pardon my language, Bonnie said, I'm going to buy that VCR and tell him to shove it up his ass. That shows you the animosity around this VCR, and that's why the initial judge said, that's coming in, but then Judge Hill said, no, it's not. The VCR being on the top of her body when she's killed, how can that not be relevant? And was it hearsay? It seems like the exceptions to the hearsay rule here were totally ignored. First of all, was that, let's take that particular statement, I don't have time, they're in our brief, but that particular statement, the defense didn't seek to introduce that to show that Bonnie intended to shove it up his blank, they wanted to show the animosity, how much fear was here, how this shows Bonnie's state of mind and John's state of mind, because they were arguing so much about it, and if indeed Bonnie did tell John how she felt, because she said, I'm going to tell him, if she did tell him, that would explain why he killed her and why it ended up on top of her in the bathtub. The state says all the VCR shows is a failed marriage, anger, and contention. Well, I agree with that, but I think it shows a lot more. And the Lange case we cited talks about, it is well settled that statements which indicate that a clearance state of mind are admissible as exceptions to the hearsay rule. So this indicates Bonnie's state of mind. And in that Lange case, what they said is, we also want to look at, are they reliable? Well, three witnesses testified that they had a conversation with the decedent, and she indicated her unhappiness in her marriage to the defendant and her intention of leaving him. The fact that victims individually relayed the information, that the victim relayed the information to three people, supports the conclusion that was so some truth to it. It's exactly the same situation here with all these people saying the marriage was horrible. The statements of Bonnie, all of them, VCR, everything was relevant to rebut John B coming in there and saying, oh, we got along great. Bonnie had a boyfriend at the time of her death. And John, this man who from the record looks like a horrible human being, said, oh, she had a boyfriend. I was glad she was going on with her life. That's what the jury heard. So it is very surprising that all these, that Judge Ghan's rulings were reversed. And I'm not saying that they had, there was no discretion here, but it is very surprising these obvious correct rulings were changed, not to mention the other ones. I'll briefly touch on forfeiture by wrongdoing. I wish I could present the court. I looked for a case where a third party suspect, the doctrine had been applied and I did not, I was unable to find one. I submit though, the underpinnings of the doctrine suggest it should be applied here. John B should not, when there is sufficient evidence to show he killed this witness, he should not benefit by being able to bar her out of court statements. But I can, anticipating if I were the court, I would say, do you have a case? And I do not. I can just say, I believe the doctrine could be applied here and maybe it's a case of first impression. Quickly as to prejudice, this was a close case. I mean, what is so, the jury sent out a question, how many washes does it take to remove blood that is measurable for DNA purposes? And the court, as you would figure, said, you've heard the evidence like we always do. But that's what the jury wanted to know. That's the only question. So we're putting a man in prison and we don't even know these two specks of blood that were not photographed, by the way. We don't know what they look like. But two from a man in the state will say, well, he had all these excuses. I would do the same thing. I would be talking to Carol saying, when was I last there? I got a show when I was last there and I don't remember. Or the cat got me. I cut myself shaving. We know he had serious nosebleeds because Carol said I had to pack his nose at one point. These were so bad as people get. So I don't believe Carol said a couple things. She said that about the nosebleed. And she also talked about how before the grand jury, she was kind of tricked into testifying the way that she did to say he had not been there for several months. So I think it's important to remember that Carol is not biased. One would think, well, Carol's hurt his wife. Well, yeah, this is not any kind of marriage most of us have ever heard of. And Carol's not favoring the defendant. Carol is best friends lifelong with Bonnie. And I think you can read from this record that if Carol thought there was a second that David did it, she would be testifying against David. As to the rest of the hearsay, I believe either it wasn't admitted for the truth of the matter asserted or it needed to be heard because this man's defense was cut out. So much the jury didn't know. And they had a question about John B. They wanted to see his testimony from their note and they wanted to know if he ever had a restraining order. So for all those reasons, I believe that the conviction should be vacated on the sufficiency of evidence argument. And if the court does not see fit or accept that, then the trial court errors being the case you remanded for a new trial. Thank you. Questions. I do have a question. In your brief, you mentioned chambers versus Mississippi and homes versus South Carolina. Is there an Illinois court that accepts those decisions that that has adapted those decisions and use them in a case? I guess I can't say for sure, Your Honor. OK. I mean, there's Supreme Court cases. So yes, that's that. But we've never applied it in Illinois. It's never come up in Illinois. I believe I believe, though, that if we can show sufficient indicia of reliability, then justice requires that Illinois courts have decided that justice requires that those statements should be admitted. Right. OK. And I have a couple. I'm sorry, just just a couple. And they're real more more factual than anything else. Was there a motion to exclude the blood evidence? I don't I did not see one. Because it seems to me that, you know, even though we're we're arguing or you're arguing sufficiency, really much of the argument in the briefs is about reliability. But there was no thought or there was no attempt to preclude the admission of that evidence at trial. I don't believe so. I think they just argued the weight at trial. And then the second point that I just want to clear up, because there is a lot of conversation or discussion around John and his motive. But my reading is that John filed for the divorce. Is that correct? It's not that the decedent was seeking the divorce. I'm reading that John actually filed for the divorce. Yes. And I think that is consistent with her saying that John told me that we don't get divorced in his family and I will if I leave him, he will kill me. So I think that would have scared her from filing first. But I'm sure she was happy at the time that he did file. Well, that explains that. But what would prompt him if he if he thought divorce was not something that occurred in his family? Why would he then file for divorce? That kind of is not does not. I do see what your honor is saying, but I think in light of all the things that were said about John B and what he did to this woman, it shows the that one could only conclude that this was not a happy, amicable relationship at the time of her death. And in your brief, you talk about the VCR placement on the body as being a signature. Couldn't it just as easily have been a decoy? I didn't know about the argument with the VCR. I mean, and I know that the state argues that as a possibility. You state it's a signature, but couldn't it just as easily have been a decoy? I don't believe that. That's quite a from a man with no serious criminal. That's quite a planned. We have a murder here that according to the state, again, there's no motive. But if you believe them, he went into a blind rage really for no reason at all. And then he has the wherewithal to say, oh, I'm going to pin this on John. Let me get that VCR. I think it's far more likely in this passion killing that it is what it is. John did this, and that was, if not a signature, it just shows what the rage was from him toward this woman. I mean, any type of, I think the point is this murder is so clearly performed by John that you have to then say, of course, well, now we have to say that with no evidence that he planted it. I mean, any evidence that makes it look like John did it since there was so much evidence against him is the state has to argue, well, then it was planted because we agree that it looks like John did it. So I think it's possible that if this guy was a criminal mastermind, that he could have thought that far ahead and committed a murder like that. But I think also, if you look at this disorganized crime scene where he turned on the water for whatever reason, inviting someone to find out what happened, that's not what happened. This was chaos. This was flying into a rage, and John did it. But even if this court found that John didn't do it- I'm listening to the flying- I'm sorry? I'm listening to the flying in a rage. The apartment was neat. What is the rage and what is the disarray? We can't argue, of course, it wasn't a crime of passion. It could have been a crime of passion by any defendant, really, who came into the unit and perhaps wanted to have his way with the decedent. But what is this flying into a rage and a crime of passion? There's no evidence that the apartment was in any means in disarray. Well, there was evidence that had been cleaned up a bit when we find things in the bathtub was in disarray, all sorts of things thrown in there. And I think John's history suggests that he would go into a rage, unlike the defendant with absolutely no history of that and no reason to do it. Isn't there some evidence, though, from Carroll that John would become upset with her if he perceived that she were out with other individuals? You're describing as this well-mannered kind of guy. But Carroll, in her own testimony, offers up that she didn't tell him pretty much where she was going or when she was going and with whom because he would become upset. Is that part of the evidence that the jury heard as well? I think the jury heard that or David, that Carroll would get mad at or David would be possessive because he didn't like Carroll going out drinking without him, which I think would is very kind of common sense. But there's no indication that, yeah, he would then beat me. He would then threaten to kill me. None of that. So how can we even give that any credence when you think about what John did, which is beating her and threatening to kill her and demonstrating how he did so? I think David's actions are normal. And Carroll never never saw fit to divorce him. There was no history. And then again, we're talking about it isn't Carroll that ended up dead. It's Bonnie. That's that's the other thing. My question is, you know, I go through this and although motive is not something that we're supposed to consider, but I look for intent here. And after I look at intent, I say, everything here is circumstantial. Even the blood does not clear. You know, I don't know how much blood because it doesn't say really says two drops. I don't see how they could even get decent DNA off of two drops. It just seems as though the whoever argued this case for the state must have been exceptional because it appears that this case was one not well defended. And two, it just it there. Everything is against John. There's nothing really here against the defendant. As far as I can see, as I say, is there anything more than the two drops of blood is to circumstance other than the circumstantial evidence? And that's why I started my argument that way. I don't believe there's any when they have to resort to things like only the defendant would have known where to find the garbage can. I mean, there is absolutely nothing here. And they're trying to make and then this man is approached in 23 years plus later. And then his I don't think I've ever seen a weaker case. And even the blood, you get into other issues that would be proposed conviction. But, you know, what wasn't tested? What was compared against John? Those types of things. Why wasn't there an expert? Why wasn't there an expert to talk about the blood on the towel and give some expert testimony about how long the blood would stay there and what type of wash would get rid of it, et cetera, et cetera. So I don't I don't believe there was anything but the two stops of blood. And I believe they were just merely circumstantial. And although there can be great circumstantial evidence, they weren't good circumstantial evidence. The defendant wasn't barred from presenting any expert evidence to challenge the DNA evidence. So I'm just picking up on your statement that there wasn't expert testimony, but you weren't barred from presenting that below. I didn't do the trial, but I but yes, I said that's post conviction. I hope I don't get there. Um, any further questions? He was represented by the public defender. Uh, I don't believe so. Was a private attorney. I believe so. I guess I'm not sure. I'm sorry. I'm not sure. The defendant had spent nights he routinely spent nights in the apartment. Is that correct? When when Barbara was gone, Carol would invite him to spend nights at the apartment. The state may quibble with routinely. But yes, I believe he'd come over on occasion. It was very all over the board 20 going back. I don't remember how often I was there, but absolutely he was invited there. He would spend the night, especially when Bonnie was gone. All right. So obviously, you know, there would be trace evidence of him in the apartment because he was in the apartment. Exactly. I mean, I looked around my house for blood of my own. I didn't find any, but I figured there's got to be some drops of blood somewhere. I don't think drops of blood in a home or anything. And we don't know anything about her washing practices or how much in the jury did ask how many walk. That's what they cared about. Right. And the the evidence about John's reaction to things that Barbara was doing, was that do is there any testimony in the record? I looked for it, but I couldn't find it that the that there was a fight over the custody of the daughter, Sandy. Yes, there was. There was a custody dispute. OK, he would have testified his the overall tenor of his testimony would have been everything was fine at the time she died. But he also admitted to it got very contentious at times and it was undisputed. There was a custody dispute at one point, certainly. All right. And he was paying child support. I know he was. What I know about the money is that he was going to be paying alimony that was still being disputed in court. But again, in his testimony, he said, yeah, there was a fight over alimony and we were arguing, but it was up to the lawyers. We were letting the lawyers handle it and we were happy with each other. OK, I just was looking for that and I couldn't find anything about child support. But I don't know about child support, but I know that there was still an argument at the time of her death over alimony. All right. Child support's a root cause of a lot of trouble. So we I was looking for it. But thank you very much. Thank you, Christine. You can proceed now. Thank you. May it please the court counsel. This defendant was not charged and convicted just because there were two random drops of blood in the apartment. This defendant was charged and he was properly convicted by overwhelming evidence because his blood was found on the same towel as the victim's blood, which was used to clean this crime scene. As the defendant concedes in his brief, the defendant had no right to be in that apartment. And in fact, this evidence shows that the defendant had not been inside that apartment for months. Contrary to this claim, Justice Puchinski, he was not a regular overnight visitor. In fact, when Carol and the defendant were originally asked about his presence at the great pains to distance defendant from that apartment and regarding this towel specifically, the defendant never explained the presence of his blood on the towel mixed and on the same towel with the victim's blood, which was used to clean the crime scene. He tried to come up with three explanations, but at no time did the defendant even himself admit that he ever used a towel in that apartment. Carol went to some lengths to try to cover for the defendant. She initially told the officers Fuller and Amato in the cold case that the last time defendant had been in that apartment was months before and that the defendant rarely there. And the defendant said the same thing. Oh, I'm rarely there. He was not a regular visitor. And in fact, as noted earlier, Carol went to great lengths to deceive her husband with whom she never really lived. She was going out and she went to great lengths not to tell him that she was going out. But let's talk about this blood evidence. The blood evidence was damning, exculpatory or inculpatory and was inexplicable by the defendant. At no time does he ever admit using a towel in that residence. Carol never testifies that he used a towel. And in fact, she refuted the notion that he would have used a towel. She did admit that he had a couple of nosebleeds, a big one, maybe in January or February. She remembered that because it was cold and they were using a space heater. But she testified that she packed his nose with ice and used gauze. The defendant at one point even talks about when he would get nosebleeds, he would grab a tissue or clothing so that it wouldn't stain something. He didn't use a towel for a nosebleed. And even if he had used a towel for a nosebleed, which is not in this record, and nor is that an inference that can be made, it is clear that this apartment was pristine. You could have eaten off the floor in this place. Carol even testified the morning that the victim was killed, excuse me, that it was Bonnie's intention to take a nap, do some laundry, and then I think she was supposed to go to see her boyfriend, Benny, in the evening. Her hamper, although the lid is closed, shows there aren't any clothes in there. There's no way these two women left an unused towel around for months that just happened to have defendant's blood on it. There's no explanation for the blood. He never testifies that he caught himself shaving and used a towel. She never, Carol never says that he ever shaved in the apartment and used a towel and blood on the towel. There's no explanation for the defendant's blood on the towel. And that towel is placed on the garbage can on the way out. What we do know is that the killer was still in the apartment when Sheila, the downstairs neighbor, came upstairs at seven o'clock. There's a little speck of blood behind Bonnie's bedroom door where the defendant was and he closed the bedroom door when she was first up there. She went back downstairs, saw the ceiling, that it was turning a pinkish color. The water was turning a pinkish color. Within minutes, she's back upstairs and by the time she gets back upstairs, that bedroom door is now open. She interrupted the killer. This is after seven o'clock and we know that John is on the other side of the city with his daughter way past that time. The bottom line is the defendant uses John to be the killer as a convenient excuse to never address the damning evidence in this case that, as Justice Cobbs notes, is a great diversion. Not only is the VCR diversion, so is blaming John. The jury heard this evidence and they knew that the police had investigated him extensively. John is the one who's coming to the police upon finding out his wife has just been murdered. He's cooperating with the police for months. He's been questioned repeatedly. Do you think that the police officers didn't suspect him at the get-go because they're in the process of a divorce? Which, by the way, was not contentious by the time the victim was killed. Defense counsel completely overstates John being, what did he call him, a horrible human being and that he was violent. He was always beating Bonnie. There's no evidence of that. Those are hearsay statements made by Bonnie as she's about to separate from her husband. We know that John's the killer. He was the one that showed up. You think the police didn't give him a once-over that night, all the times he was at the police station being interviewed before the grand jury? Of course, he was the obvious first suspect. And the fact that the defendant was not ever arrested initially, it's because the police didn't even know he existed. Not because they had crossed him off the list. They didn't know the guy ever existed. The blood evidence was the most damning evidence. The blood on the towel with the victim's blood used to clean the crime scene was inexplicable and proved that defendant was there bleeding on this towel when he was cleaning the crime scene because there's no other evidence for the presence of that blood. Justice Smith, I know you made a comment about how you don't know how the DNA could have been done. Well, that's the way DNA is done. There's no question about the competency or the admissibility of the DNA in this case. In fact, the defendant concedes it's his blood, but tried to offer some kind of an explanation, three in fact, for the presence of his blood. And those were all properly rejected from the jury because he never testifies, nor does Carroll, that he ever used a towel in that apartment. Defendant doesn't have an innocent explanation for his towel, his blood being on the same towel as the victim's blood used to clean the crime scene. There's also the defendant's constant statements, the changing statements between him and Carroll. Before they knew about the defendant's DNA, they went to great lengths to distance the defendant from the apartment. Been there rarely, they both told the police, rarely came over. Maybe I was in there four or five times. Carroll says the same thing until the DNA is revealed. And then the defendant initiates a phone call with Carroll. And in that phone conversation, you can hear him trying to get her to change her story. Well, maybe it was a couple of weeks. He's drastically attempting to get that window of time of when he was in that apartment to be much shorter than originally he and Carroll ever attested. Carroll's only willing to go so far. She's willing to say, well, she had met several times on the stand. It had been months. Yes, I made that statement. I did testify to that at the grand jury. She's on record repeatedly. It had been months since the defendant was there. And again, no towel usage. The defendant was able to present his version of an alibi, and the jury simply chose not to believe it. Also on the video, when the defendant is being interviewed by Fuller and Amato in Boulder, he never comes out and says he was working that night. He says, oh, I worked at Michael Jordan's that day. I was in the park drinking. He never says, oh, I worked every night. It was a Saturday night. I would have been at work that night. He never says that. He's trying to play the police officers. And he can't wait in that interview to serve John off as an obvious suspect. And the bottom line about the VCR is that he and Bonnie, John and Bonnie were not furiously arguing about the VCR. The evidence was that Bonnie asked John to pay for it. And he said no. And he was kind of irritated that she was getting one because he didn't want his daughter watching TV. If she was going to watch tapes, he can come over to my place to do that. He didn't want to pay for it. That's hardly the enraged motive to kill his wife. There is no evidence that real killer. The only claims that are made are just that. They're simply claims. John has a rock solid alibi. He's on the other side of the city with his daughter. All of these claims that John was this horrible human being. There's testimony that he was drunk when they were originally married and went to go slap the victim and instead hit Angela instead. The jury heard that. There's nothing to do with him having a motive to kill this victim. People don't need to establish a motive. And in fact, you have to be clairvoyant to establish a motive unless you have a statement, which we don't have in this case. Why did the defendant do this? The defendant who was a Mexican police officer and knew how to erase evidence in a bathtub. A defendant who knew well enough to clean up the crime scene and get her in water and throw all kinds of stuff on her. And as important as the VCR, the defendant claimed was nowhere does defense counsel John Fulton, who was a private attorney, does he ever introduce any evidence about the VCR being on top of the victim? None of the photos that were introduced into evidence there before this court show the victim submerged in the water. The VCR had been removed from her body at that time. And when I was looking at the pictures, you can see the VCR, but it's on the dining room table and the doors to the shower had been removed and were leaning up. I think he gets the break front in the dining room. The defense counsel never brings forth any evidence about the VCR. He could have done a lot with the VCR. He didn't. And there was no ineffective assistance of counsel claim before this court. The bottom line is that the defendant and Carol had a terrible relationship, the most bizarre relationship. They both testified to that. And that was clearly the case. They had a contentious relationship and inexplicable relationship. They both tried to distance the defendant before knowing about the DNA. And then they shorten that time. Of course, Carol doesn't want to believe that her husband killed her best friend in the apartment. And the other point of guilt, too, although these are these are, again, circumstantial evidence of guilt, when the defendant finds out that Bonnie has just been brutally murdered in the apartment that his wife and infant daughter live in, what does the defendant, a former police officer do? Absolutely nothing. Is he nervous or scared that his wife and daughter in danger? Where are they going to live? What are the police officers have? I need to keep my wife and child safe. The guy doesn't do anything. He's in the park drinking when Carol has to go find him to explain what happened. Does he offer to go to the he spends every opportunity trying to avoid the police. He doesn't go with Carol to find out what happened. He's not worried about his wife and daughter because he knows they're not in any danger. And then when Carol calls him 20 years later and says, hey, these guys are in cold case and they want you to call him, he doesn't and then tries to fake that he's like diabetic sick. When they do find him, he tries to get out of the interview. And when he realizes he really can't do that, he's Mr. Bravado in that interview. Watch the video with defendant with the detectives Fuller and Amato. It is telling. He is able to recall 20 some years later the significance of the VCR. If it was, if it wasn't significant defendant, how would he remember that 20 some years later? And if it was so important to tell Fuller and Amato 20 some years later, why in God's name didn't he go to the police when his wife and child's roommate had just been brutally murdered in their apartment to let them know about this riveting evidence? He didn't. I did. As for the admissibility of any of the hearsay statements, those are clear. Those were inadmissible hearsay. There is no abuse of discretion in any of those rulings. And for all of the reasons stated here today, and those in our brief, the people respectfully request that this court affirm defendant's murder conviction. Christine. Um, I don't know where you got the, you, we have all the circumstantial evidence. We don't know that the defendant was in that room or behind the door. That's all sir. That's all created. There's no evidence that that occurred. Sure there is because there's her blood is on the back of her door on the wall. It doesn't have anything to do with it. Sure. It does of his being there. Sure. It does. No, it doesn't. It's irrelevant. No, it's not. Well, I think it is. Okay. And number two, you're saying his blood, you did they ever, other than the two drops, was it ever brought out that there was blood elsewhere of his? No, those were the only places where his blood was found was on the same towel as her blood that was used to clean the crime scene. Okay. And again, justice, what you stated was that it was the blood behind the door. Well, it wasn't his blood. Then her blood is her blood is there's a little speck behind her. It's not his. Okay. That's one. And then the other question I have is you criticize my comment about the DNA, but are you aware that after 10 years, DNA is almost useless? It hasn't been tested that purposely because I did DNA that's number one, but we're talking about now, now you're right. It wouldn't be, but back then it wouldn't be the same because they couldn't do to blood 20 years later what they can do now. Right. So it's questionable that that blood should have even come in. Absolutely not. That is not an issue before this court. I understand that. I'm just saying the evidence in this case is all circumstantial. As most cases are, if you don't have an eyewitness or you don't have a confession, cases are circumstantial and the defendant's blood being on the same towel is the victim's blood used to clean the crime scene is damning circumstantial evidence, coupled with all of the other evidence I talked about today. And in my brief that clearly shows that the defendant was the killer. Anything from anybody else? Talking about the two blood drops on the same towel that had Carol, that had Barbara's blood on it. Bonnie. I'm sorry, Bonnie. I'm sorry. I said Barbara before, and I apologize for that. Bonnie, Bonnie's blood on it. There, there was testimony that you couldn't tell how long his blood had been on the towel. The DNA expert did testify that was impossible to tell, especially 20 years later. So it is possible. And you've stated very energetically and passionately that which, you know, is your style and that's fine. I respect that, but really, you know, we could, we could mellow out a little bit here. I apologize. You've stated that his, these two drops of blood were on the same towel that was, had Bonnie's blood on it. So you've got circumstantial evidence. You've got hypotheses. I can say that it is hypothetical that at some point, not the after one of his nosebleeds, dabbed it up with this towel, threw the towel in the wash, washed it 10 or 12 times, put the towel back in the towel cabinet. And the, whoever actually killed Bonnie grabbed a towel, which by now has, you know, been put back in the cabinet and used it to mop up the blood that was created by Bonnie. What I'm, I'm sort of surprised that there's only two drops of blood of this defendant. If he in fact used it to clean up Bonnie's blood and there are two knives, butcher knives used to stab her. I'm always a little surprised that there isn't more of any defendant's blood in a situation like that. And I suppose it's possible, but I think that it is equally possible that this is a towel that was just a household towel that was used once and washed and washed and washed again. And the DNA experts said, I don't know how many times it's been washed. I don't know if it's been washed. I don't know when that blood got there. I don't know if that blood got there the same time Bonnie's blood got there. And that to me creates a whole different set of circumstances than what you're talking about is though somehow he got only two drops of blood on this towel while he was cleaning up the blood from Bonnie. I, I, I just, I think, you know, it's, it's not perfect. No, it's not perfect. Of course it's not. Otherwise we wouldn't be here. In response to your argument though, justice Puchinsky, you are throwing up reasonable hypotheses of innocence, which ignores the standard of review that all of the evidence has to be taken in a light, most favorable to the state. Excuse me. I'm not throwing out a hypothesis of innocence. I'm saying I'm answering your statement that there wasn't any other explanation for this blood to be simultaneously with Bonnie's blood. And certainly there was. So it's a mistake to, for us to buy into the argument that everything that you've said is absolutely unchallengeable in at the proper time. It could have been challenged at trial and certainly could have been challenged on a, on appeal in some way. But I think that it's a mistake for us to totally accept the fact that it's crystal clear that his two drops of blood got there at the same time that Bonnie was being killed and were fresh and new pieces of blood with her blood on the same towel. I think there's another explanation that could have been explored. Well, that again is a reasonable hypothesis of innocence. And the defendant offered three explanations for why his blood was on the towel. He conceded it was his blood on the towel. That's not an issue. He said, okay, I had these nosebleeds, like a couple of them. Carol says, yeah, yeah, yeah, he did. But I packed it with ice, the big one, like in January and February, because of the space heater, she remembered that. I packed him with ice. And I think she would use the word gauze. She never says the defendant ever used a towel. The defendant himself never used a towel. And I'm not suggesting... All right. Doug, your position. Do the closing. You're muted. We can't hear you. Your mic's on. Briefly, I certainly... Just to follow up on that point about the lack of blood, two specks in a very bloody murder scene. I mean, I guess the allegation is that he suffered a paper cut or something like that. It doesn't make sense. And then also, the state called this overwhelming evidence. I can't believe in any universe how this could be called overwhelming evidence. I think it's a stretch to call it sufficient. I think that lacks credibility. To say that he never said he used a towel to clean his nose. I mean, again, his statements are a quarter century later. He never denied using a towel. How is such a detail? He's supposed to remember when he bled in the apartment and what he used to clean it up. And he ever asked, did you ever use a towel? Did he deny it? I don't believe so. But even if he did, that's a stretch. Counsel said he didn't testify that he ever cut himself shaving. He did on page 966. So he definitely said, I cut myself shaving. I don't know when. He did try these different explanations, I think. And that makes sense. I'm trying to remember 25 years ago now that I know my life is over if I don't remember. And he's throwing these things out just like they're his side. She was closer to Bonnie. He should not be prosecuted because his marriage was weird. There's no evidence that he beat her. Counsel says that, well, John B., it's all hearsay that he beat Bonnie. No, the incident was John came home drunk. John wanted to hold the child. John got in a fight both with Angela and hit both Angela and Carol. So that's not hearsay. That was heard by the jury. But the jury did not hear all the other allegations about the threats to kill her and the other beatings of her. The counsel said defense counsel didn't do a lot with the VCR. That's because defense counsel was barred from putting in the statements about the VCR. They could not say she told him that she was going to have to shove this blank, blank, blank. And I think that is the main thing. I thank you. I really think this is one to look closely at as the evidence and all the hearsay should have come in, especially after John testified what a wonderful marriage they had and how they were just the divorce was just going swimmingly and the jury did not get to hear all the problems that existed and the truth. All right. Thank you both. You both really argued. Well, I wish the two of you had been the trial attorneys. I think we would have had a much clearer case if the two of you had argued the case at the trial level. So thank you very much. We'll let you know as soon as we figure out if the three of us or two of us agree.